IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

DAVE E. BINKLEY, JR.,

        Plaintiff,

v.                                    No. CIV 02-1496 LFG

JO ANNE B. BARNHART,
COMMISSIONER OF
SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION AND ORDER

Plaintiff Dave E. Binkley, Jr. ("Binkley") invokes this Court's jurisdiction under 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner determined that Binkley was not eligible for disability insurance benefits ("DIB"). Binkley moves this Court for an order reversing the Commissioner's final decision and remanding for a rehearing. [Doc. Nos. 14, 15.]

### Procedural History

Binkley was born on April 30, 1952, is divorced and has no children. He lives in a mobile home park in Albuquerque and apparently is assisted a great deal by his sister who lives in Ohio. In 1983, he obtained his Master's Degree in nutrition. Since that time he has held a number of jobs, including a nutritionist for the State of New Mexico and a part-time professor in nutrition for the University of Phoenix. He has also held a number of part-time jobs as a tutor of students and a

caterer.  He was most recently employed as a nutrition consultant for a company in which he held an ownership interest.   In some of his previous positions, he supervised up to 90 people.  [Tr. at 84.]

Binkley's application for DIB indicates a date of April 21, 2001.  [Tr. at 52.]  He claims the onset of a mental disorder on December 30, 1998.  [Tr. at 14, 52.]  He was 50 years old at the time of the administrative law hearing in 2002, and alleges that he is unable to work because he has a "bad brain."  [Tr. at 199.]  More specifically, Binkley contends that he is unable to concentrate for any length of time, and that he cannot get along with people in a work setting.  [Tr. at 208, 210, 212.]

On July 17, 2002, Administrative Law Judge William F. Nail, Jr. ("ALJ" or "Judge Nail") held an administrative law hearing with respect to Binkley's application for DIB.  [Tr. at 191.]  In a decision, dated July 26, 2002, Judge Nail found that Binkley was not eligible for benefits.  Judge Nail concluded that Binkley's residual functional capacity ("RFC") was compatible with the performance of routine, low stress work, with no public contact and with no more than limited contact with co-workers.  [Tr. at 16.]  Although the ALJ concluded that Binkley was not able to return to his past relevant work, he determined, after testimony of a vocational expert ("VE"), that there was other work existing in the economies that Binkley could perform.  [Tr. at 16-17.]  Binkley requested a review by the Appeals Council, and on October 25, 2002, the Appeals Council denied the request. [Tr. at 5.]  This appeal followed.[1]

---

[1]In August 2003, Binkley filed an Addendum to Notice of New Application stating that he had filed a new application for DIB on September 10, 2002 with an onset date of disability of July 27, 2002, the day after Judge Nail's opinion was issued.  [Doc. No. 16.]

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[2] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining his burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[3]

Briefly, the steps are: at step one, claimant must prove he is not currently engaged in substantial gainful activity;[4] at step two, the claimant must prove his impairment is "severe" in that it "significantly limits his physical or mental ability to do basic work activities . . . .,"[5] at step three, the Commissioner must conclude the claimant is disabled if he proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[6] and, at step four, the claimant bears the burden of proving he is incapable of meeting the physical and mental demands of his past relevant work.[7]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering

---

[2]20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[3]20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[4]20 C.F.R. § 404.1520(b) (1999).

[5]20 C.F.R. § 404.1520(c) (1999).

[6]20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means his impairment is "severe enough to prevent him from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[7]20 C.F.R. § 404.1520(e) (1999).

claimant's RFC,[8] age, education and past work experience, he is capable of performing other work.[9] If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove he cannot, in fact, perform that work.[10]

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994). To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991). The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992). The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98. In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence. Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he

---

[8]One's RFC is "what you can still do despite your limitations." 20 C.F.R. § 404.1545(a). The Commissioner has established RFC categories based on the physical demands of various types of jobs in the national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[9]20 C.F.R. § 404.1520(f) (1999).

[10]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

> chooses not to rely upon, as well as the significantly probative
> evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner.  Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

Judge Nail carefully considered the record in this case, including all of Binkley's psychological treatment records, which are sparse.  The ALJ also thoroughly considered all of the evidence presented at the administrative law heating, including the testimony of Binkley and the VE.  In reaching his decision that Binkley was not disabled within the meaning of the Social Security Act, Judge Nail's findings include the following:  (1) Binkley did not engage in substantial gainful activity since the alleged onset of disability; (2) Binkley's combination of impairments, while "severe," did not meet or equal any of the listed impairments; (3) Binkley's allegations regarding his limitations were not totally credible; (4) Binkley's RFC was for the performance of routine low stress work with no public contact and limited contact with co-workers; (5) Binkley was unable to perform any of his past relevant work; and (6) Binkley could be expected to make perform other work that exists in significant numbers in the regional and national economies. [Tr. at 17-18.]  Thus, the ALJ concluded that Binkley was not under a disability, as defined by the Social Security Act, at any time through the date of the July 26, 2002 decision.  (Tr. at 18.)

In this appeal, Binkley asserts that the case must be reversed and remanded based on his contention that the RFC finding is not supported by substantial evidence and is based on incorrect legal standards. [Doc. No. 15.]  The Commissioner argues that the ALJ's decision should be affirmed

because substantial evidence supports the ALJ's decision and because the decision is a correct application of the regulations. [Doc. 17.]

After a review of the entire record, this Court finds that the ALJ's decision was supported by substantial evidence, and that there is no error in that decision. Therefore, Binkley's motion to reverse and remand will be denied.

<u>Summary of Binkley's Employment and Medical Condition</u>

Binkley claims an onset date of December 30, 1998 for a mental disorder, and yet it is not entirely clear from the record why he selected the December 30 date. He testified at the administrative law hearing that he worked up until January 2000 as a nutrition consultant, or until he sold the company and was subsequently fired by the new owner. [Tr. at 197-98.] However, there is apparently no report of income for Binkley since late 1998. [Tr. at 215.]

Binkley's very few medical records begin in January 1999. He had an appointment with the Presbyterian Heart Group for palpitations and atypical chest pain. However, the testing revealed mostly normal results. [Tr. at 128.] In April 1999, he was referred by his primary care physician to Dr. Christina A. Seeger, a psychiatrist. [Tr. at 148.] Dr. Seeger saw Binkley for medication management and actually had very few appointments with him over the next three years. [Tr. at 211.] Binkley testified that he was financially unable to see a psychologist for regular counseling even though he would like to get therapy for his problems. [Tr. at 211.]

On April 20, 1999, Dr. Seeger saw Binkley for the first time. His primary care physician had recently placed him on 30 mg of Paxil, an anti-depressant. Dr. Seeger's office record notes that Binkley had had difficulty concentrating over the last year and problems maintaining good sleep. His brother, who apparently had similar problems, had committed suicide at some point. Dr. Seeger

indicated that Binkley was sleep deprived and had some irritability, but did not have any suicidal ideation.  Binkley told Dr. Seeger that he was depressed ten years ago when he was divorced.

Dr. Seeger's April 20 record documents that Binkley appeared to say he drank 1-3 beers nightly for a number of years and marijuana nightly.  Dr. Seeger also wrote "20 years drank and used too much." [Tr. at 149.]  It is not clear from this record whether Binkley was currently drinking and using marijuana every night, and there is little exploration of this topic in the doctor's notes.  At the administrative hearing, however, Binkley testified that he drank 1 to 2 to 3 beers every night and used marijuana socially with friends several times a month.  [Tr. at 207-08.]  During the April 20 appointment, Dr. Seeger noted that Binkley's affect was superficially bright and that she had difficulty engaging him in any depth.  [Tr. at 148-49.]

Dr. Seeger saw Binkley a month later, and in May 1999, Binkley told her he was "almost back to normal" on 40 mg of Paxil.  [Tr. at 147.]  She had also prescribed Trazadone for Binkley and he was sleeping better, and reported improved concentration and energy.  Binkley's only other appointment with Dr. Seeger in 1999 was in August.  At that point, he still felt very good and had good motivation.  His concentration was excellent.  [Tr. at 147.]  During part of 1999, Binkley was being tested and monitored for high cholesterol.  He continued to take Paxil and Trazadone.  His medical records indicated a continuing diagnosis of depression.  [Tr. at 121, 122, 124, 138.]

In 2000, Binkley did not see Dr. Seeger.  He was taking Lipitor for his high cholesterol, and continued to take Paxil.  [Tr. at 119.]  The early 2001 medical records from Presbyterian again show that he was taking Paxil and Lipitor and that his depression was stable on Paxil.  [Tr. at 112-15, 127.]

In 2001, Binkley began the application process for DIB.  In the Disability Report, he reported his conditions to be depression, sleeplessness, loss of self confidence, poor business decisions, and

an inability to concentrate for long periods and get along with co-workers.  [Tr. at 62.]  He claimed

his problems were genetic as his sibling had had similar problems and committed suicide.  [Tr. at 70.]

On April 23, 2001, Binkley filled out the Daily Activities Questionnaire related to his DIB

Application and stated that he was not limited in a physical sense but that he had problems getting

along with others.  He observed that he was a "bone head and tend[ed] to argue small points."  [Tr.

at 77.]  He further stated that he got along terrible with supervisors and that he was fired from most

jobs.  He had been evicted from his home, did not complete projects and had poor concentration.  If

he disagreed with someone, he would yell, scream, swear and get in their face.  [Tr. at 78.]  He

explained that when had worked, he was able to go to work on time and keep up with his work.  He

was still taking 40 mg of Paxil as of this date.  [Tr. at  78.]

In early 2001, it also appears that he was involved in some unrelated state civil lawsuits.  A

restraining order against him appeared to have been entered in one lawsuit, and a judgment for

restitution for non-payment of rent was entered in another.  [Tr. at 44, 46, 50.]

After filing his Application for DIB, Binkley visited Dr. Seeger again, apparently for the first

time in over a year.  The May 2, 2001 office record indicates that Binkley had returned to Dr. Seeger

because of "personal problems."  He was "pissing people off", had "started several lawsuits", and had

a restraining order on him with respect to his previous business partner.  He was easily agitated and

verbally aggressive.  He was not able to stay sufficiently organized to remain self employed.  Dr.

Seeger noted that he was drinking 2-3 beers at night and that he was filing for SSI.  She was

considering whether Binkley had "BAD" – bipolar affective disorder.  [Tr. at 147.]

On May 17, 2001, Dr. Seeger wrote a letter to Binkley's attorney who was handling the

lawsuit Binkley had filed against his former business partner.  In the letter, Dr. Seeger stated that she

8

had treated Binkley for depression in 1999 but had also observed something odd about him and that she recently concluded that he might have a bipolar disorder. She had started to treat him with a mood stabilizer (Depakote) in addition to the Paxil. Dr. Seeger concluded in the letter that Binkley's judgment was impaired by a mental disorder and opined that he should withdraw from any legal proceedings for the next six months until his condition was under control. [Tr. at 144.]

On May 23, 2001, Dr. Seeger again saw Binkley who noted that he had not observed any differences after starting on the Depakote. However, Dr. Seeger found that he appeared calmer. He was not sleeping too well at that time. [Tr. at 146.]

On July 2, 2001, Binkley reported to Dr. Seeger that he believed he was less reactive emotionally and sleeping better. He still had cognitive problems with concentration but he clarified that his concentration was 80% better than it was during the years before he began the Paxil. He was working on non-profitable projects then. Dr. Seeger increased the Depakote. [Tr. at 146.] It does not appear that she saw him again that year.

However, on July 26, 2001, Dr. Seeger filled out a Psychological Source Statement of Ability to Do Work-Related Activities for Binkley. [Tr. at 151.] She found that he was moderately limited in his ability to understand and remember detailed or complex instruction, but not limited as to very short and simple instructions. She noted that he reported improved ability to concentrate, but found him moderately limited in sustained concentration and task persistence. Dr. Seeger found that he was moderately limited in social interactions with the public and co-workers/supervisors and that he had been emotionally labile with poor impulse control regarding his emotions. He was moderately limited in his ability to adapt to changes in the workplace. She wrote that he did not have a problem with

alcohol or substance abuse and opined that she believed he could manage benefits in his own interest. Dr. Seeger did not find Binkley to have any "marked limitations" as of July 2001. [Tr. at 151.]

In contrast to Dr. Seeger, Binkley's sister Della Hudak filled out a third-party questionnaire on August 5, 2001, in which she indicated Binkley could not possibly take care of his own money and/or benefits. Hudak, while living in Ohio, appears to handle Binkley's bills and many other miscellaneous housing arrangements for him. [Tr. at 88.] She bought him a trailer and paid his bills for him, but he tended to write bad checks and would not even send his sister his bills in a timely manner. Hudak felt she had to take care of everything from Ohio because she could not get him to take care of his life. She observed Binkley could do minor household chores and recreational activities like surfing the net and watching TV. He liked to talk about politics and nutrition with people but was quiet and withdrawn at family gatherings. Hudak described Binkley as belligerent, cocky and argumentative, particularly with people in authority. She was concerned about him because their brother, with similar problems, had committed suicide. Hudak noted that Binkley's problems had started about four years ago, but she did not know why. [Tr. at 91.]

On September 12, 2001, Dr. Elizabeth Chiang filled out a mental capacity assessment of Binkley for disability services. It did not differ significantly from the July 2001 assessment filled out by Dr. Seeger. Dr. Chiang found Binkley moderately limited in his ability to carry out detailed instructions and to maintain attention and concentrate for long periods. He was moderately limited in his ability to interact appropriately with the general public, accept instructions, respond to criticism and work with others. [Tr. at 159-60.] She noted signs and symptoms of depression but found that those complaints did not appear to cause severe work limitations. He could perform work that did not require a lot of public interaction. [Tr. at 161.]

10

On September 17, 2001, Binkley's underlying request for benefits was denied.  [Tr. at 26.]

It does not appear that Dr. Seeger saw Binkley between the July 2001 assessment and October 2001.  However, on October 19, 2001, Dr. Seeger filled out a Physician's Questionnaire, again in relation to Binkley.  She gave him a medical diagnosis of bipolar type 2.  She noted objective findings of chronic depression that had only partially responded to the anti-depressant treatment.  She stated that Binkley had a history of impulsive behavior and problems regulating his anger, along with a serious sleep disturbance.  This time, for some reason, Dr. Seeger gave him marked, instead of moderate, limitations in several categories.  [Tr. at 157.]  There are neither office visit records nor any other explanation in the record indicating why Dr. Seeger changed her assessments from those she gave Binkley just three months earlier.

In 2002, there are no office visit notes reflecting appointments with Dr. Seeger, and actually no medical records at all.  However, based on testimony given at the administrative hearing, Binkley appears to have seen Dr. Seeger on one or two occasions in 2002, before the hearing.  On July 17, 2002, Judge Nail held the administrative hearing, at which Binkley was represented.  Both Binkley and a VE testified at the hearing.  When asked what bothered him or kept him from working, Binkley testified that he was diagnosed with Bipolar and that the problem was in his brain.  [Tr. at 199.]  He noted he had seen Dr. Seeger only infrequently over the last three years.  [Tr. at 200.]  He visited with friends on occasion and talked to them on the telephone, but rarely went out.  [Tr. at 203.]  He watched basketball on TV but had no hobbies.  He was able to do housework, shopping and tend a small garden.  [Tr. at 204.]  He did some walking and was able to take care of his personal needs.  [Tr. at 206.]  He said he could not concentrate enough to read or watch TV shows.  He tended to blow up at people.  [Tr. at 210.]

A VE, Karen Provine ("Provine"), testified at the hearing.  Provine testified that Binkley had past relevant work as a nutrition consultant, which was a skilled occupation.  [Tr. at 216.]  The ALJ asked Provine to consider Binkley's age, educational background and experience along with no physical limitations but because of mental concerns, limitations as to public work, contact with co-workers and simple low stress repetitive work.  [Tr. at 217.]  Judge Nail further informed the VE that there were moderate restrictions in some areas such as Binkley's ability to interact with public co-workers and supervisors, ability to adapt to changes in the work place, and moderate restrictions in detailed or complex instructions, and ability to carry out instructions, attend and concentrate and do work without supervision.  [Tr. at 217.]  Judge Nail stated that he believed these limitations were consistent with Dr. Seeger's July 2001 assessment.  [Tr. at 218.]  The VE concluded that Binkley would not be able to do any of the past relevant work she had outlined.  [Tr. at 218.]  However, based on the hypothetical, Binkley could perform as an office helper, which would permit limited contact with co-workers and supervisors.  [Tr. at 218-19.]  In addition, he could perform the job of a small products assembler and kitchen helper.  [Tr. at 219.]

Binkley's attorney then questioned the VE whether Binkley could perform those jobs if he had a marked impairment in some of the categories discussed above.  [Tr. at 220.]  Provine testified that such limitations would eliminate Binkley's employment in those other jobs.  [Id.]

Subsequent to this hearing, Binkley's attorney wrote to Judge Nail stating that Dr. Seeger had recently written a letter on Binkley's behalf but that he had not received it until the day after the administrative hearing was held.  [Tr. at 183.]  Binkley's attorney enclosed Dr. Seeger's letter for the ALJ's review.  Dr. Seeger's letter is undated and addressed to Binkley's attorney.  The letter states that Binkley may look very competent but is not.  He is unable to maintain relationships due to his

12

erratic emotional behavior. He may say and do things that appear threatening to others and he becomes extremely emotional. Dr. Seeger reported that Binkley could not be swayed and did not recognize any middle ground. The intensity of his emotional responses was nearly psychotic in Dr. Seeger's estimation. He had impaired judgment and would not be able to maintain himself in any occupational situation. Binkley's attention was impaired to the point he would not be able to maintain a work focus if he worked alone. Dr. Seeger found him fully disabled and opined that he would remain that way for at least a year. She diagnosed him with a mood disorder, NOS, and a personality disorder. [Tr. at 184-85.]

On July 26, 2002, Judge Nail issued his decision denying the request for benefits. In that decision, he discussed all of the medical evidence including Dr. Seeger's most recent undated letter to Binkley's attorney. [Tr. at 16.]

**Discussion**

## I.   **RESIDUAL FUNCTIONAL CAPACITY ("RFC") FINDING**

Binkley primarily challenges the ALJ's RFC finding on the basis that it is incomplete under Social Security Ruling ("SSR") 96-8p. More specifically, he argues that the ALJ failed to explain why certain restrictions set out by Dr. Seeger in her July 2001 responses to the questionnaire were not included in the ALJ's RFC finding. Finally, Binkley contends that the underlying problem in the case was that Judge Nail "took all the limitations caused by the mental impairment and merely reduced the RFC to routine, low stress work with no public contact and limited contact with coworkers."

The ALJ is entrusted with the determination of a claimant's RFC and such determination must be based on all of the evidence in the record. 20 C.F.R. § 404.1546; Corber v. Massanari, 2001 WL

1203004 at *5 (10th Cir. 2001).  The ALJ must evaluate a claimant's physical and mental RFC, must

determine the physical and mental demands of the claimant's past relevant work and finally determine

if the claimant has the ability to meet the job demands despite any physical or mental limitations.

Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003).

      Social Security Ruling ("SSR") 96-8p defines "RFC" as "an administrative assessment of the

extent to which an individual's medically determinable impairment(s), including any related

symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his

or her capacity to do work-related physical and mental activities."  1996 WL 374184 at *2 (July 2,

1996).  SSR 96-8p requires that the ALJ's RFC assessment be based on all of the relevant evidence

in the case, including medical history, medical signs and laboratory findings, the effects of treatment,

reports of daily activities, medical source statements, and the effects of symptoms, including pain, that

are reasonably attributed to the claimant's medically determinable impairments.

      Further, the RFC assessment must consider and address medical opinions from treating

sources.  "Controlling weight" must be given to a treating physician's opinion about the nature and

severity of a claimant's impairments if "it is well supported by clinical and laboratory diagnostic

techniques and if it is not inconsistent with other substantial evidence in the record."  20 C.F.R. §

404.1527(d)(2); Doyal, 331 F.3d at 762.  An ALJ, however, may disregard a treating physician's

opinion if it is not so supported.  Id. (citing Castellano v. Sec'y of Health & Human Servs., 26 F.3d

1027, 1029 (10th Cir. 1994)).  In determining the weight to assign a treating physician's opinion, the

court looks at the length of the treatment relationship, the frequency of examination, the nature and

extent of the relationship, the treatment provided, and the kinds and extent of examinations and

testing the provider performed.  Doyal, 331 F.3d at 763.  The regulations require that the ALJ give

good reasons in his opinion for the weight that he gives to a treating physician's opinion.

Before deciding on the appropriate weight owed to a physician's opinion, it must be

determined whether the doctor is a treating physician.  Typically "[t]his requires a relationship of both

duration and frequency."  Doyal, 331 F.3d at 762.

> The treating physician doctrine is based on the assumption that a
> medical professional *who has dealt with a claimant and his maladies
> over a long period of time* will have a deeper insight into the medical
> condition of the claimant than will a person who has examined a
> claimant but once, or who has only seen the claimant's medical record.
> . . . [T]he assumption that the opinions of a treating physician warrant
> greater credit that (sic) the opinions of [other experts] may make scant
> sense when, for example, the relationship between the claimant and
> the treating physician has been of short duration. . .  Moreover, a
> longstanding treatment relationship provides some assurance that the
> opinion has been formed for purposes of treatment and not simply to
> facilitate the obtaining of benefits.

Id. at 762-63 (emphasis in original) (internal citations omitted).

## II.    ANALYSIS OF THE ALJ'S RFC FINDING

Judge Nail carefully and thoroughly reviewed the medical records supplied by Binkley.  The

ALJ discussed the inconsistencies between Dr. Seeger's two different evaluations of Binkley, that

were completed only three months apart.  [Tr. at 15.]  He observed that Dr. Seeger's later evaluation

indicated "marked impairments" in a number of different areas while the earlier evaluation showed

moderate impairments in the same categories.  Judge Nail's decision noted that Dr. Seeger's earlier

report in which she assessed moderate impairments was supported by some contemporaneous clinic

notes that indicated Binkley was feeling much better, was less reactive emotionally and had improved

concentration.  [Tr. at 15.]  The ALJ acknowledged that Dr. Seeger changed her July assessments

in the later October questionnaire, but observed that there was no evidence showing Binkley had seen Dr. Seeger after July 2001. [Tr. at 15-16.]  Thus, Judge Nail discounted the second Seeger report and relied on the first report that was supported by office visit records and that was generally consistent with similar assessments performed by state agency mental health consultants. [Tr. at 16.]

In examining the question of Binkley's RFC, Judge Nail also discussed Binkley's testimony as activities that he could perform.  For example, Binkley testified that he could do minor household chores, watch TV and use the Internet.  He was able to drive as well as visit and socialize with friends.  Binkley tended a garden, did his laundry, shopped, and took care of his personal needs. [Tr. at 16.]  Binkley also testified that he had no physical restrictions as to his abilities to sit, stand, walk, etc. [Tr. at 206-07.]  Indeed, he stated on one form that he had no problem in attending work or keeping up with his work when he was employed.  For all of these reasons, along with the fact that state agency mental health consultants generally agreed with Dr. Seeger's first assessment of Binkley, Judge Nail concluded that Binkley had "moderate" limitations in social functioning, concentration, persistence and pace. [Tr. at 15.]

First, the Court rejects Binkley's argument that the ALJ did not base his RFC on positive evidence in the record or that Judge Nail failed to address Binkley's limits on work-related activities. There is substantial evidence in the record, in the form of Dr. Seeger's July 2001 assessment, state mental health consultant's similar findings, and Binkley's own testimony to support the RFC findings. Binkley was found to be only moderately limited in the ability to carry out detailed instructions moderately limited in the ability to maintain attention and concentration. [Tr. at 151, 159.] The RFC findings took those limitations into account by concluding that Binkley could do only simple routine tasks since his ability to follow more complex instructions was compromised.  The findings that he

16

was moderately limited in his ability to interact socially also were considered and made part of the RFC. Any work that he could do required no public contact and no more than limited contact with co-workers. Thus, the Court determines that there was no error in the way the ALJ made his RFC findings, and concludes that substantial evidence supports the RFC.

The Court next rejects Binkley's contention that Judge Nail failed to explain why he purportedly did not discuss Dr. Seeger's July 2001 and/or the state agency doctor's moderate limitations in the RFC finding. In support of this argument, Binkley cites to the Disability Determination Services' restrictions, including moderate limitations as to Binkley's ability to understand/remember detailed or complex instructions, moderate limitations as to social interactions and moderate limitations as to Binkley's ability to adapt to changes in the workplace. [Doc. 15, p. 4; Tr. at 159-60.] As explained above, Judge Nail discussed these very limitations. "The record supports limitations in social functioning and the ability to maintain concentration, persistence, and pace of 'moderate' severity." [Tr. at 16.] "[H]is ability to follow more complex instructions is compromised." [Id.] The ALJ also noted that Dr. Seeger's July 2001 assessment of some moderate limitations was consistent with the state agency mental health consultant's similar conclusions. [Tr. at 16.] Thus, the Court finds no basis for Binkley's argument that Judge Nail failed to acknowledge Binkley's moderate limitations.

However, to the extent that Binkley's argument might be read to mean that Judge Nail should have consider Dr. Seeger's later report (and/or undated letter) in which she concluded Binkley had a number of "marked" limitations, the Court rejects that argument as well. Here, Dr. Seeger's October 2001 opinion was not well supported by clinical and laboratory diagnostic techniques. Indeed, she apparently conducted no testing of Binkley. Moreover, there are no office records that

might support the October 2001 changes of limitations, and the October 2001 assessment, for reasons unknown, is inconsistent with Dr. Seeger's own earlier assessment. The ALJ also properly recognized that the length of the treating relationship was relatively short with very infrequent visits to Seeger. It was not the type of treatment relationship that provided any assurance as to the opinions Dr. Seeger reached in October 2001. *See* <u>Doyal</u>, 331 F.3d at 762-63.

Lastly, the Court finds unconvincing Binkley's argument that the ALJ's use of the phrase "low stress work" failed to provide the VE with sufficient information of Binkley's mental impairment. The VE testified that she had heard the testimony at the hearing and had had an opportunity to review the vocational record. The ALJ asked the VE to consider someone who, because of mental concerns, required limited contact with coworkers, and simple low stress repetitive work. The ALJ further informed the VE that Binkley had moderate restrictions in his abilities to interact with public co-workers, to adapt to changes in the work place, to understand detailed or complex instructions, to concentrate and to work without supervision. [Tr. at 217.] The VE actually repeated many of the restrictions before providing further testimony. [Tr. at 218-19.] The Court concludes that there was no error by the ALJ in using this phrase, particularly under these circumstances where the ALJ provided additional information to the VE regarding Binkley's limitations. Moreover, the Court finds no general prohibition on the use of the phrase "low stress work" or "low stress environment." *See, e.g.,* <u>Liessmann v. Barnhart</u>, 2002 WL 31450793 at *3 (10th Cir. Nov. 4, 2002) (affirming decision of Commissioner where ALJ concluded that plaintiff was limited to work in a low stress environment and found that the plaintiff could perform certain jobs).

**Conclusion**

For all of the above stated reasons, the Court concludes that the ALJ committed no error and that substantial evidence supports his RFC findings.

IT IS THEREFORE ORDERED that Binkley's Motion to Reverse and Remand for a Rehearing [Doc. No. 14] is denied for the reasons stated herein and that this matter is dismissed, with prejudice.

_Lorenzo F. Garcia_
Lorenzo F. Garcia
Chief United States Magistrate Judge

19